1

2

3                                                        ** E-filed on 8/8/06 **

4

5

6

7                                  NOT FOR CITATION

8                      IN THE UNITED STATES DISTRICT COURT

9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                               SAN JOSE DIVISION

11

12   RICHARD LYTEL,                          Case Number 05-01937-JF

13                       Plaintiff,          ORDER[1] DENYING SIMPSON'S
                                             MOTION FOR SUMMARY
14         v.                                JUDGMENT

15   JANET SIMPSON,                          [re: docket no. 281]

16                       Defendant.

17   _____

18   AND RELATED CROSS-ACTION

19   _____

20

21         Defendant Janet Simpson ("Simpson") moves for summary judgment as to all claims

22   asserted by Plaintiff Richard Lytel ("Lytel").  Lytel opposes the motion.  Having considered the

23   briefs, the applicable law, and the arguments of counsel at the hearing on July 28, 2006, the

24   Court will deny the motion, for the reasons set forth below.

25

26

27   _____

28         [1] This disposition is not designated for publication and may not be cited.

# I. BACKGROUND

In December, 2000, Sun Microsystems, Inc. ("Sun") employed Simpson as a Strategic Sales Development Representative in Dallas, Texas.  In August 2003, Lytel worked at Sun as Vice President of the Advanced System Development ("ASD") Center in Menlo Park, California. On September 18, 2003, Simpson transferred to the Life Sciences project with the understanding that she would work under the direct supervision of Lytel but would continue to work out of Sun's offices in Dallas and travel as needed to Sun's offices in Menlo Park and laboratory facilities in San Diego.

What happened over the next year is contested by the parties.

In or around June 2004, Simpson filed a complaint with Sun's Human Resources Department ("HR") asserting that while working under Lytel's supervision she was the victim of sexual harassment and retaliation.  As part of the complaint process, she submitted two letters to Cheryl DeBorja of HR: the first is dated July 12, 2004, Declaration of Janet Simpson in Support of her Motion for Summary Judgement ("Simpson Decl."), Ex. A (hereinafter "HR Letter 1"); the second letter is dated July 19, 2004, Simpson Decl., Ex. B (hereinafter "HR Letter 2").  The first letter identifies seven numbered emails requested by HR, lists thirty-three numbered "inappropriate actions" taken by Lytel (hereinafter "Letter 1 nos. 1-33"), and notes that additional incidents, emails and events are not included in the letter.  HR Letter 1, p. 1-3.  The second letter, in the course of responding to "follow-up" questions, includes details regarding ten incidents, some of which were mentioned, though in less detail, in the first letter (hereinafter "Letter 2, nos. 1-10").  Following an internal investigation conducted by Sun, Lytel's employment with Sun ended in August 2004.

Lytel filed a complaint in this Court on May 10, 2005, in which he makes four claims for relief that are based, at least in part, on the contents of the two letters from Simpson to HR described above ("the HR letters").  Lytel claims (1) defamation by libel in violation of California Civil Code § 44, et. seq, (2) defamation by libel in violation of California Civil Code § 45, et. seq, (3) intentional interference with prospective economic advantage, and (4) intentional infliction of emotional distress.  On September 20, 2005, the Court granted Simpson's motion to

Case No. C 05-0193 JF
ORDER DENYING SIMPSON'S MOTION FOR SUMMARY JUDGMENT
(JFEX2)

1    strike Lytel's first through fourth claims pursuant to California Civil Procedure Code Section

2    425.16 ("anti-SLAPP statute"), to the extent that they are based upon statements Simpson made

3    to the DFEH.

4         On June 22, 2006, Simpson filed the instant motion for summary judgment on all four of

5    Lytel's claims, or in the alternative, for partial summary judgment on those claims based on

6    privileged conduct where no showing of actual malice has been made.[2]

7

8                              **II. LEGAL STANDARD**

9         A motion for summary judgment should be granted if there is no genuine issue of

10   material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

11   56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears

12   the initial burden of informing the Court of the basis for the motion and identifying the portions

13   of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that

14   demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

15   317, 323 (1986).  "When the nonmoving party has the burden of proof at trial, the moving party

16   need only point out 'that there is an absence of evidence to support the nonmoving party's case.'"

17   *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477

18   U.S. 317, 325 (1986)).

19        If the moving party meets this initial burden, the burden shifts to the non-moving party to

20   present specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e);

21   *Celotex*, 477 U.S. at 324.  A genuine issue for trial exists if the non-moving party presents

22   evidence from which a reasonable jury, viewing the evidence in the light most favorable to that

23   party, could resolve the material issue in his or her favor.  *Anderson*, 477 U.S. 242, 248-49;

24   *Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991).

25

26   _____

27        [2] On June 21, 2005, Simpson filed a counterclaim against Lytel and Sun, alleging ten
     claims for relief.  On May 8, 2006, the Court granted Lytel's motion for summary judgment as to
28   Simpson's retaliation claim.  Simpson's motion for reconsideration of that ruling is pending.

                                        3

1          **III. DISCUSSION**

2  **A.   Defamation Claims**

3          In seeking summary judgment of Lytel's first two claims, Simpson argues that with

4  respect to Simpson's letters to HR, Lytel has failed to meet his burden of producing evidence

5  from which a reasonable jury could find malice on the part of Simpson.  Without evidence of

6  malice, Simpson argues, the letters are publications subject to conditonal privilege under

7  California law and provide no basis for a defamation claim.[3]

8          Simpson's evidentiary showing makes clear that the conditional privilege set forth in

9  California Civil Code § 47(c) may be applicable to Simpson's formal complaint to Sun about

10  sexual harassment by Lytel.[4]  *See Cruey v. Gannett Co.*, 64 Cal.App.4th 356, 369 (1998) (holding

11  that complaint to employer about workplace harassment is conditionally privileged, subject to a

12  _____

13          [3] The parties disagree as to whether Lytel's defamation claims are based only on libel
14  arising from Simpson's statements to HR (as Simpson argues), or are also based on slander or
   other verbal statements made by Simpson to non-interested parties outside of Sun's HR
15  department (as Lytel argues).  Simpson argues that the two letters to HR form the basis for
   Lytel's defamation claims, noting that they are the only written statements that Lytel identified as
16  defamatory in response to interrogatories during discovery.  Lytel, citing various depositions and
   emails in which Simpson states that she communicated with others regarding harassment by
17  Lytel, argues that besides her letters to HR, Simpson published falsehoods about Lytel to non-
18  interested persons, and that these statements are not privileged under § 47(c).  Given these
   conflicting views as to the facts and events supporting the defamation claims, Simpson requests
19  summary judgment as to Lytel's first and second claims for relief, in their entirety, or, in the
   event that the Court finds the claims are based on statements other than the two HR letters, for
20  partial summary judgment encompassing all those claims arising from the Simpson's written
21  statements to HR.

22          [4] The relevant portion of California Civil Code § 47 reads:

23          A privileged publication or broadcast is one made:
24                                                                                      . . .
   (c) In a communication, *without malice*, to a person interested therein, (1) by one
25  who is also interested, or (2) by one who stands in such a relation to the person
   interested as to afford a reasonable ground for supposing the motive for the
26  communication to be innocent, or (3) who is requested by the person interested to
27  give the information.

28  Cal. Civ. Code § 47 (emphasis added).

1  finding of malice).  Thus, the burden is on Lytel to defeat the privilege by showing that Simpson

2  made the statements with malice.  *See Kashian v. Harriman*, 98 Cal. App. 4th 892 (2002)

3  (holding that once defendant shows allegedly defamatory statement was made on a privileged

4  occasion, the burden shifts to plaintiff to show defendant made the statement with malice).

5      "Malice for purposes of [§ 47] means a state of mind arising from hatred or ill will,

6  evidencing a willingness to vex, annoy, or injure another person."  *Kashian*, 98 Cal.App.4th at

7  896.  Malice in fact "may be proved directly or indirectly, that is to say by direct evidence of the

8  evil motive and intent, or by legitimate inferences to be drawn from other facts and

9  circumstances in evidence."  *Burnett v. National Enquirer, Inc.* 144 Cal.App.3d 991, 1007-08

10  (1993).

11      Lytel argues that a jury could make a reasonable inference of malice based on evidence

12  that Simpson had no reasonable basis for believing the statements she made in the HR letters.

13  Lytel argues that Simpson essentially ignores the existence of many material issues of fact as to

14  the truth of Simpson's claims to HR, commenting that, "[t]here is no undisputed fact regarding

15  any of Simpson's fabrications about Lytel."  Opposition, p. 12.  Additionally, Lytel argues that a

16  jury could infer malice because Simpson withheld emails that would have shown that her charges

17  were untrue.  Finally, he argues that Simpson's conduct and attitude after being promoted to

18  Director in May 2004 supports an inference of malice.

19      Malice is not inferred from the communication alone.  Cal. Civ. Code § 48.[5]  However,

20  "for one to assert the defense of conditional privilege he must believe the defamatory matters to

21  be true."  *Russell v. Geis*, 251 Cal.App.2d, 560, 566 (1967).  "'[A]ctual malice' . . . is

22  established by a showing that the publication was motivated by hatred or ill will towards the

23  plaintiff *or by a showing that the defendant lacked reasonable grounds for belief in the truth of*

24  _____

25      [5] California Civil Code § 48 states:

26      In the case provided for in subdivision (c) of Section 47, malice is not inferred
27      from the communication.

28  Cal. Civ. Code § 48.

1   *the publication* and therefore acted in reckless disregard of the plaintiff's rights." *Sanborn v.*

2   *Chronicle Pub. Co.*, 18 Cal.3d 406, 413 (1976) (emphasis added) (finding reasonable jury could

3   infer malice from evidence that speaker lacked good faith belief in defamatory statements, thus

4   defeating conditional privilege under § 47).

5   "[N]egligence is not malice.  It is not sufficient to show that the statements . . . were

6   inaccurate, or even unreasonable." *Kashian*, 98 Cal.App.4th at 931 (declining to find malice

7   speaker had not investigated adequately claims regarding land purchases) (citations omitted).

8   Mere inadvertenance or forgetfulness, or careless blundering, is no evidence of malice." *Davis v.*

9   *Hearst*, 160 Cal. 143, 167 (1911).  "Only willful falsity or recklessness will suffice.  It is only

10   when the negligence amounts to a reckless or wanton disregard for the truth, so as to reasonably

11   imply a wilful disregard for or avoidance of accuracy, that malice is shown." *Kashian*, 98

12   Cal.App.4th at 931 (citations omitted).  Thus, "'inaction,' i.e., failure to investigate, which 'was a

13   product of a deliberate decision not to acquire knowledge of facts that might confirm the

14   probable falsity of [the subject] charges' will support a finding of actual malice." *Antonovich v.*

15   *Superior Court*, 234 Cal.App.3d 1041, 1048 -1049 (1991); *see also Roemer v. Retail Credit Co.*,

16   3 Cal. App.3d 368 (1970) (holding that knowledge of falsity, but not mere negligence, is enough

17   for an inference of malice).

18   *Brewer v. Second Baptist Church*, upon which Lytel relies, is in harmony with recent

19   cases interpreting the § 47 conditional privilege, noting that "[p]rotection of the [conditional]

20   privilege [is] lost, by the publisher's lack of belief, or of reasonable grounds for belief, in the

21   truth of the defamatory matter." *Brewer*, 32 Cal.2d 791, 797 (1948).  *Brewer* further held that "if

22   the facts believed to be true are exaggerated, overdrawn, or colored to the detriment of plaintiff,

23   or are not stated fully and fairly with respect to the plaintiff, the court or jury may properly

24   consider these circumstances as evidence tending to prove actual malice." *Id*. at 800.  In *Brewer*,

25   the court upheld a libel verdict where evidence would have supported an inference that defendant

26   church exaggerated the cause of a member's dismissal or lacked reasonable grounds for its

27   statements about the members. *Id*.

28   Simpson seeks to distinguish *Brewer*, arguing that in contrast to the speaker in that case,

6

"Simpson believed everything she told Cheryl DeBorja to be true," Reply p. 2-3, Simpson Decl. p. 2. This argument fails primarily because whether Simpson believed her statements remains a material issue of fact. Whether the conduct Simpson described occurred as she described is a question separate and apart from Simpson's declarations as to her subjective belief.[6] Nor is the issue settled by the results of Sun's investigation. In addition, as Simpson notes in a footnote, the speaker in *Brewer* admitted only that he knew the statements had not been proven true by a court proceeding, not that he knew that they were false. *Brewer*, 32 Cal.2d at 800.

Simpson seeks to distinguish both *Antonovich* and *Roemer*, because the defendants in those cases "had no personal knowledge" of the people about whom they wrote, while Simpson had "direct personal knowledge" of everything she reported to HR. Opposition, p. 3. However, Simpson's personal knowledge put her in a better position to know whether her statements were true, such that a jury that found them to be false or greatly exaggerated could reasonably infer malice under the line of cases running from *Davis*, *Brewer*, and *Sanborn* through *Roemer*, *Antonovich* and *Kashian*.[7]

---

[6] Although Simpson states in her declaration that: "all of my statements to Sun's Human Resources as reflected in my July 12, 2004, letter to Cheryl DeBorja ("DeBorja") were accurate," and that she "did not say anything in that letter which I did not believe to be true and almost all of my statements were supported by e-mails from Rick Lytel to me," this does not show the absence of a triable issue of fact regarding her belief. Nor does her declaration that "[t]he sole purpose in filing my honest claim with Sun's Human Resources Department was to get someone at Sun to stop Rick Lytel from harassing me," demonstrate the lack of a triable issue regarding her purpose in filing the claim. *See* Simpson Decl. ¶¶ 2-4.

[7] Simpson argues that "even a finding of ill-will on the part of the speaker does not defeat the privilege of section 47(c) if the communication was nonetheless made for a proper purpose," citing *Vackar v. Package Machinery Co.*, 841 F. Supp. 310, 315 n.3 (N.D. Cal., 1993) (citing *Stockton Newspapers v. Superior Court*, 206 Cal.App.3d 966, 979 n.3 (1988), *disapproved on other grounds in Brown v. Kelly Broadcasting Co.*, 48 Cal.3d 711, 733 n.18 (1989)). However, the issue *Vackar* was whether the ill will of the original source of statements precluded a subsequent republisher from invoking the privilege, and the dictum cited by Simpson does not carve out an exception to the rule that malice defeats the privilege—an exception that would, in effect, swallow the rule. *Stockton* stated that a defendant's being "actuated" by "feelings not inconsistent with an honest desire to protect his own or another's interests will not conclusively establish malice," but did not establish improper purpose as an additional element that must be established to defeat the privilege. Finally, *Vackar* itself recognizes that a speaker's disregard for

1    In order to establish malice and defeat the privilege, Lytel must show that Simpson either

2    wilfully lied in her statements to HR or otherwise lacked a reasonable basis for believing her

3    statements to be true and not unfairly exaggerated.  The Court concludes that there are triable

4    issues of fact as to whether Simpson's statements to HR were false or exaggerated, and that these

5    issues in turn flow from underlying issues of material fact regarding Lytel's conduct with respect

6    to Simpson.  Given Simpson's "direct personal knowledge" of the contents of her statements,

7    evidence creating triable issues of fact as to whether the conduct that Simpson described

8    occurred at all, or in a way that provides a reasonable basis for her statements, creates a triable

9    issue of fact as to malice.  There are many material issues of fact as to Lytel's underlying

10    conduct.  Many of these issues turn on either issues of credibility or the weighing of conflicting

11    evidence, which are matters for the jury in its role as the trier of fact.  Without attempting a

12    comprehensive review of all such issues, the Court now turns to some of the significant factual

13    issues concerning whether Simpson's statements to HR were accurate.

14        *Alleged Requests for Cooking, Fashion Show and Visiting Simpson's Home in Dallas*

15    Simpson stated to HR that Lytel "[r]equest[ed] home cooked meals at my home when he

16    visited Dallas," and that he "[r]equest[ed] that I give him a fashion show in all of my high heels"

17    on September 29, 2003.  Letter 1, ## 1-2, Letter 2, # 1.  She wrote that Lytel "sen[t] me e-mails

18    requesting to visit where I 'work and live,' knowing I work from home and telling me that I

19    'could take him to dinner (hint hint).'"  Letter 1, # 3; Letter 2, # 9.  Simpson maintains that Lytel

20    asked to "come to [her] home" so she could "cook a steak dinner, and after dinner put on a high

21    heel (stiletto) fashion show for him, and then we'll see what happens."  Simpson Decl. ¶ 8.

22    Lytel declares he never proposed dinner and a fashion show, and that "hint, hint" merely

23    referenced Simpson's email promise to buy Lytel a steak dinner in Dallas.  Declaration of

24    Richard Lytel in Opposition to Defendant Janet Simpson's Motion for Summary Judgment

25    ("Lytel Decl."), Ex. 5.  He points to Jeanne Galipeaux's declaration that Simpson "bragged" of a

26

27    the truth defeats the privilege.  *Vackar*, 841 F.Supp. at 314.

28        Simpson's argument, even were it to succeed, simply moves the triable issue of fact from
      ill will to purpose, but would not thereby show that summary judgment is appropriate.

8

1   collection of "ultra sexy" heels.  Declaration of Jeanne Galipeaux in Opposition to Defendant

2   Janet Simpson's Motion for Summary Judgment ("Galipeaux Decl.") ¶ 5.  Lytel states that this

3   prompted his kidding reference to Simpson as "shoe lady" in an email he provides, and he notes

4   Simpson's reply email declining dinner due to a new diet.  Lytel Decl., Exs. 5, 6.  Lytel cites his

5   reply to Simpson's reply to the "live and work" email in which he states that he was not inviting

6   himself to Simpson's home, but just to the "Dallas Office." Lytel Decl., Exs. 7, 9.  Whether

7   Simpson's statements were exaggerated or had a reasonable basis in actual events is a question

8   for the jury, involving issues of credibility that the Court may not resolve at the summary

9   judgment stage.

10        *Lytel's Constant Hugs, Kisses*

11        Simpson further claims that Lytel engaged in "[c]onstant unwanted hugging" and

12   "unwanted kissing."  Letter 1, ## 4-5.  She stated that Lytel "grabbed me twice and hugged me"

13   at the CTO All-Hands Meetings on May 17, 2004.  Letter 2, # 10.  She stated that "[a]fter telling

14   him three times to stop" he sent her "notes that I should help him with his problem."  Letter 1, #

15   23.

16        Lytel has produced evidence that Simpson often initiated and enjoyed hugs, including an

17   email of August 21, 2003, in which Simpson writes "I love hugs," and Galipeaux's declaration

18   that Simpson "hugged virtually everyone she greeted."  Lytel Decl., Ex. 11, Galipeaux Decl. ¶ 4.

19   Simpson disputes the authenticity of the email.  Koray Bulut Decl. ¶¶ 2-3.  Regarding kissing,

20   Lytel cites inconsistencies between Simpson's statements to Sun and her deposition as to whether

21   an alleged kiss was witnessed.  Lytel Decl. ¶ 4e.  Lytel argues that Simpson has mischaracterized

22   his reply to Simpson's questions about a presentation she reviewed, in which he wrote, "It's clear

23   you feel I touch too much for a VP–continue to work with me here, and I'll become more

24   effective and, through this, better be able to help you be effective."  Simpson Decl., Ex. R.

25   Whereas Simpson claims this references her requests to stop touching *her*, Simpson Decl. ¶ 12,

26   Lytel claims that "touch" refers to including things in his work, as a "hands on" manager.  Lytel

27   Decl.¶ 4o.  Given the evidence, there is a triable issue of fact regarding the truth of Simpson's

28   statements about hugging and kissing, and whether she intentionally mischaracterized Lytel's

1   "touch too much" message.[8]

2       *Showing False Familiarity*

3       Simpson stated to HR that Lytel "Show[ed] false familiarity w/ friends and co-workers,"

4   and that he "invited her long time friends to dinner." Letter 1, # 11.  Simpson's statement

5   describing Lytel as showing "false familiarity," is called into question by evidence either that no

6   such showing was made or that the familiarity was not false.  Lytel has offered evidence

7   documenting exchanges of email between Lytel and Simpson going back to at least June 2003.

8   *See* Lytel Decl., Exs. 12-15.  In these emails, the tone of which might be reasonably characterized

9   as friendly, Simpson mentions friends that live in San Diego, her musical interests, and thanks

10  Lytel for lunch.  Lytel has produced other email in which Simpson makes positive, friendly

11  remarks about him.  Lytel Decl. ¶ 4f, Exs. 12-20.  Lytel states in his declaration that Simpson

12  shared other "intimate" details of her life.  Lytel Decl. ¶ 4f.  Taken as a whole, the evidence Lytel

13  has presented could support a reasonable inference that Lytel and Simpson were friends and that

14  Lytel's familiarity was not contrived.

15      *Sharing Sexually Oriented Short Stories*

16      Simpson's first letter claims that Lytel "[p]rovided sexually oriented short stories he

17  wrote then ask[ed] if 'they turned me on.'" Letter 1, # 14.  Simpson further claims that Lytel told

18  her, by phone, that "he thinks of a certain paragraphs [sic] (mainly the first two paragraphs of the

19  story) and what he could do when thinking about me." Letter 1, # 22.  Lytel concedes that he

20  sent two stories, "The Angry Young Man" and "The Startup" to Simpson.  Both stories include

21  profanity, and the first story describes several sexually explicit situations.  *See* Declaration of

22

23      _____

24      [8] In reaching this conclusion, the Court finds only that Lytel has produced the required
    minimum of evidence to create a triable issue for the jury.  Specifically, the Court does not
    suggest that a jury would be bound to agree with Lytel's version of events, or even that it would
25  be likely to do so.  As noted above, Simpson challenges the authenticity of the "I love hugs"
    email.  Additionally, besides the "touch" email, Simpson has produced additional evidentiary
26  support for her claims, including Brad Bailie's deposition that Lytel played "kneesies" with
    Simpson by touching her knee under the dinner table, and at another point appeared to look down
27  her dress as he leaned over her shoulder to discuss wine.  Simpson Decl. ¶ 13; Ex. E.

28

Case No. C 05-0193 JF
ORDER DENYING SIMPSON'S MOTION FOR SUMMARY JUDGMENT
(JFEX2)

1   Janet Simpson in Support of Opposition to Lytel's Motion for Summary Judgement, Ex. E.  Lytel

2   denies that either is "sexually oriented," a judgment with which a reasonable jury might agree,

3   particularly with respect to the second story.  Lytel's declaration states that the stories were

4   written in a writing class at Stanford University, and he points to evidence that Simpson told

5   Lytel's secretary that Simpson had read and enjoyed the stories.  *See* Lytel Decl. ¶ 4k, Galipeaux

6   Decl. ¶ 2.  He also provides email in which Simpson requests the stories, though this request was

7   itself a response to email about the stories from Lytel.  Lytel Decl., Ex. 35.  Finally, he argues

8   that Patricia Parseghian's recollection that Simpson told her she had read the stories conflicts

9   with Simpson's declaration that she could not make it past the first two paragraphs in "The

10  Angry Young Man."  Declaration of Eric C. Kastner in Support in Opposition to Defendant Janet

11  Simpson's Motion for Summary Judgment ("Kastner Decl."), Ex. 2.  Given the evidence, there is

12  a triable issue of fact as to whether Simpson's statement to HR about the story is true.

13          *Alleged Link Between Promotion and Behavior*

14          Simpson stated to HR that Lytel "[s]en[t] e-mails telling [me] that he wanted to make me

15  a Director.  During calls said if I behaved the way he wanted me to...starting with dinner."  Letter

16  1, # 18.  As Lytel's support for Simpson's eventual promotion is undisputed, the issue with

17  respect to malice is whether Simpson's statement mischaracterizes Lytel's position,

18  misrepresents the sequence of events or alleges a quid pro quo that did not exist.  Lytel cites

19  email from Simpson on October 7 in which Simpson requests a "Director Track Development

20  Plan," which suggests that Simpson may have initiated talk of promotion.  Lytel's subsequent

21  email messages regarding Simpson's promotion to Director include talk of professional projects,

22  but also Lytel's mention of his "fondness" for Simpson, his suggestion that Simpson could have

23  raised the issue "informally" rather than as a "boss-employee thing."  Simpson Decl., Ex. Q;

24  Lytel Decl., Exs. 26-29.  These messages reasonably might be interpreted to support either

25  Lytel's or Simpson's version of events, such that there remains a triable issue of fact as to

26  whether Simpson had a reasonable basis for making this statement in her sexual harassment

27  complaint.

28

*Blocked E-mail*

Simpson's wrote that "[d]ue to many personal e-mails, I had to block his email address from my home e-mail account." Letter 1, # 24. Lytel has offered evidence tending to show that Simpson invited him to send email to her personal account. Lytel Decl., Ex. 16. Lytel states in his declaration that he received over 100 emails from Simpson from this account between August 2003 and late October 2003, when he received an email from Simpson requesting that he "[p]lease send your e-mails to [Simpson's sun,com address] only...you are killing my little personal e-mail box...and I am getting double e-mails anyway. Lytel Decl. ¶ 4p, Ex. 44. Lytel never received messages from Simpson's personal account indicating that a message had been blocked. Lytel Decl. ¶ 4p. Given the conflicting characterizations regarding Lytel's use of Simpson's personal email address, a reasonable jury could find either that Simpson's assertion was true or that she knew her statements to be false or exaggerated.

*Sending Flowers*

Lytel has produced an email in which Simpson thanks him for sending flowers, saying they "made [her] day," and has produced a Sun presentation that suggests flowers as a recognition tool—albeit as an alternative to bonuses, promotions, and pay increases. Kastner Decl., Ex. 9. While this evidence does not contradict the letter of Simpson's statement to HR that described "sending flowers to my home," it casts Lytel's action in a more innocent light than it appears in the context of Simpson's sexual harassment filing. While certainly not dispositive, such evidence might support a reasonable inference that Simpson sought to exaggerate the scope of the harassment she alleged.

*Anti-Depressant Prescription*

Simpson wrote that Lytel "[c]aus[ed] me to get on medication due to the stress and advances he continues to create." Letter 1, # 31. However, Simpson's medical record indicates that Dr. Bruce Roberts prescribed an anti-depressant for Simpson based on stress due to her mother's Alzheimer's disease, which is consistent with Dr. Robert's deposition testimony. Kastner Decl., Exs. 4, 10. Thus, a triable issue of fact exists as to whether Simpson's assertion regarding medication was made in good faith.

12

1   Simpson argues that the Court should disregard both Galipeaux declarations, because of

2   inconsistencies between them, and should likewise disregard the whole of Lytel's latest

3   declaration because it contains "a number of contradictions" with his earlier deposition—though

4   Simpson declines to identify any specifically.  Reply, p. 13.

5       Simpson relies on the observation in *Kennedy* that "[t]he general rule in the Ninth Circuit

6   is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition

7   testimony."  However, in *Kennedy* the court *limited* the application of the rule, first articulated in

8   *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540 (9th Cir., 1975) and applied in *Foster*

9   *v. Arcata Associates, Inc.,* 772 F.2d 1453 (9th Cir., 1985), that the material inconsistency

10  between a plaintiff's deposition and his affidavit filed in opposition to summary judgment does

11  not create a genuine issues of material fact.  In *Radobenko*, the court granted summary judgment

12  against the plaintiff, Radobenko, finding that the *only* issues of fact were merely "sham issues"

13  created "because of the inconsistent statements made by Radobenko the deponent and

14  Radobenko the affiant."  *Radobenko*, 520 F.2d at 543-44.  In *Foster*, where the court found that

15  an employee's declaration that she "only expressed a preference" regarding her job location was

16  contradicted by deposition testimony that she "conditioned her employment" on a specific

17  location; the court credited only the deposition testimony in upholding summary judgment

18  against the employee.

19      *Kennedy* limited the holding in Foster, cautioning that "[c]ertainly, every discrepancy

20  contained in an affidavit does not justify a district court's refusal to give credence to such

21  evidence . . . . In light of the jury's role in resolving questions of credibility, a district court

22  should not reject the content of an affidavit even if it is at odds with statements made in an earlier

23  deposition." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, (9th Cir. 1991) (quoting

24  Kennett-Murray Corp. v. Bone, 622 F.2d 887 (5th Cir.1980)).  *Kennedy* held that before granting

25  summary judgment given a purported issue of fact "created" by inconsistencies between a

26  deposition and an affidavit, "the district court must make a factual determination that the

27  contradiction was actually a "sham," that is, "testimony that flatly contradicts earlier testimony in

28  an attempt to "create" an issue of fact and avoid summary judgment" rather than "the result of an

13

1   honest discrepancy, a mistake, or the result of newly discovered evidence." *Kennedy*, 952 F.2d

2   at 266-67.

3       Simpson argues that Galipeaux's successive declarations are contradictory because

4   Galipeaux stated that Simpson was angry in May 2004 due to salary issues, but stated that

5   Simpson was angry in June 2004 because of Galipeaux's attempts to secure an office for her next

6   to Lytel.  Reply, p. 13.  The Court finds no inconsistency here that would support a conclusion

7   that Galipeaux's second declaration is a "sham."  Likewise, as Simpson has not identified a

8   single specific contradiction with Lytel's deposition, the Court finds no basis for finding his

9   declaration to be a "sham."

10      To defeat the instant motion for summary judgment, Lytel need only present specific facts

11  showing that there is a genuine issue for trial.  Lytel has met this modest burden, having

12  presented evidence, as noted above, from which a reasonable jury, viewing the evidence in the

13  light most favorable to that Lytel, could resolve the material issue of whether Simpson's

14  statements to HR were made with malice.  *Cf. Anderson*, 477 U.S. 242, 248-49.  Given the

15  triable issues of fact as to the underlying conduct identified above, a jury might reasonably infer

16  that one or more of Simpson's statements were false, or that as a whole the statements were

17  "exaggerated, overdrawn, or colored to the detriment of plaintiff, or . . . not stated fully and fairly

18  with respect to the plaintiff."  *Cf. Brewer*, 32 Cal.2d at 800.  Although Lytel has not presented

19  evidence that contradicts every single statement that Simpson made, the evidence presented is

20  sufficient that a reasonable jury, making reasonable inferences in Lytel's favor, could find that

21  Simpson's statements as a whole were made with malice.

22      Accordingly, the motion will be denied as to Lytel's defamation claims.[9]

23  _____

24      [9] Having concluded that there are numerous triable issues of fact regarding Simpson's
statements that might support a reasonable inference of malice, the Court does not reach Lytel's
25  argument that Simpson's withholding of emails shows malice.  However, the Court notes that
whatever strength this argument has results largely from the existence of material issues of fact
26  with respect to Lytel's basic conduct, as discussed above, since this argument aims to establish
that Simpson's statements were not accurate as presented—that is, that they were instead
27  "exaggerated, overdrawn, or colored to the detriment of plaintiff, or . . . not stated fully and fairly
with respect to the plaintiff."  *Cf. Brewer*, 32 Cal.2d at 800.  The Court likewise need not reach

28

14

**B.    Intentional Interference With Prospective Economic Advantage**

Simpson requests summary judgment with respect to Lytel's third claim for relief,

arguing that this claim is based on the identical facts that underpin the defamation claims.

Simpson relies on *Vacker v. Package Machinery Co.*, 841 F. Supp. 310 (N.D. Cal., 1993).  In

*Vacker*, the court granted summary judgment for defendant regarding plaintiff's defamation

claims, which were based on statements privileged under 47(c).  The court then granted summary

judgment regarding plaintiff's claim for negligent investigation:

> In his third cause of action plaintiff reiterates the allegations set forth in support of
> his defamation cause of action and claims that these facts support a finding of
> negligent investigation.  Summary judgment is appropriate on this claim for two
> reasons. First, because the allegations of negligence are embraced by plaintiff's
> defamation claim, the privilege provisions of section 47(c) preclude a finding of
> liability. *See Stationers Corp. v. Dun & Bradstreet, Inc.*, 62 Cal.2d 412, 42
> Cal.Rptr. 449, 398 P.2d 785 (1965). Alternatively, California courts have held that
> plaintiffs may not avoid the strictures of defamation law by artfully pleading their
> defamation claims to sound in other areas of tort law. *See Felton v. Schaeffer*, 229
> Cal.App.3d 229, 279 Cal.Rptr. 713 (1991), and cases cited therein. Allowing
> plaintiffs to sue in negligence where their underlying claims sound in defamation
> would invite disingenuous attempts to evade the strictures of defamation law by
> pleading, for example, that the alleged defamer was negligent in investigating the
> truth of his statements or in republishing them.  *Id.* at 239, 279 Cal.Rptr. 713.

*Vacker*, 841 F. Supp. at 315.

As noted above, there are triable issues of material fact with respect to Lytel's defamation

claims.  Moreover, Lytel's third claim is not merely a defamation claim in disguise.  In order to

prevail on his intentional interference with prospective economic advantage claim, Lytel must

plead and prove:  (1) the existence of a valid contract or a business relationship between the

plaintiff and a third party; (2) the defendant's knowledge of this contract or relationship; (3) the

defendant's intentional acts designed to induce a breach of the contract or disruption of the

relationship; (4) actual breach of the contract or disruption of the relationship; (5) resulting

damage; and (6) that the defendant's interference was wrongful by some legal measure other than

the fact of the interference itself. *Farmers Insurance Exchange v. Zerin*, 53 Cal.App.4th 445,

---

Lytel's argument that Simpson's conduct and attitude beginning around the time of her
promotion is evidence of malice regarding her statements to HR.

15

458 (1997); *PMC, Inc. v. Saban Entertainment, Inc.*, 45 Cal.App.4th 579, 595 (1996); *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 393 (1995); *PMC*, 45 Cal.App.4th at 602-03.

Lytel's intentional interference claim, at its core, asserts that Simpson's conduct, which is not limited to her written statements, was designed to disrupt and did disrupt a valuable economic relationship that she knew existed between Lytel and Sun. The evidence needed to satisfy the different elements of this claim differs from and goes beyond that needed for Lytel's defamation claims. Accordingly, the Court concludes that the allegations of intentional interference are not embraced by Lytel's defamation claim. Although the success of Lytel's intentional interference claim could depend, in part, on the success of his defamation claim—especially regarding the sixth element—his third claim for relief is not simply a disguised defamation claim, "artfully plead[ed] . . . to sound in other areas of tort." *Cf. Vacker* 841 F. Supp. at 315. Accordingly, the motion will be denied as to the third claim.

## C.    Intentional Infliction of Emotional Distress

The elements of the intentional infliction of emotional distress are "'(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.'" *Ess v. Eskaton Properties, Inc*., 97 Cal.App.4th 120 (2002) (quoting *Cervantez v. J.C. Penney Co.* 24 Cal.3d 579, 593 (1979)).

The core of Lytel's intentional infliction of emotional distress is that Simpson's conduct, again not limited to her written statements, caused severe or extreme emotional distress to Lytel. The required evidentiary basis of this claim extends beyond the set of facts needed to prove defamation, even if certain facts are critical to both claims. The Court concludes that Lytel's intentional infliction of emotional distress claim is not merely a defamation claim in disguise. Moreover, as noted above, Simpson is not entitled to judgment on the defamation claims. Accordingly, the motion will be denied as to the fourth claim.

1

### III. ORDER

2      Good cause therefore appearing, IT IS HEREBY ORDERED that the Simpson's for

3  summary judgment is DENIED.

4

5

6  DATED: August 8, 2006

7

8

9                               _____

10                          JEREMY FOGEL
United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   This Order has been served upon the following persons:

2   <u>Counsel for Plaintiff</u>

3   eck@kastnerbanchero.com
    mbisbee@ropers.com
4   jsimonson@ropers.com
    lgonzalez@ropers.com
5
    <u>Counsel for Defendant</u>
6
    jr@rslattorneys.com
7
    <u>Counsel for Cross-Defendant</u>
8
    urosales@wsgr.com
9   ggansle@wsgr.com
    kbulut@wsgr.com
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 05-0193 JF
ORDER DENYING SIMPSON'S MOTION FOR SUMMARY JUDGMENT
(JFEX2)